# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

## Civil Division

| | |
|---|---|
| EMMANUEL AGBARA, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| AT&T MOBILITY, LLC., | ) |
| EVELYN O. OKOJI, | ) |
| NIGERIAN CATHOLIC COMMUNITY | ) |
| AT ST. JEROME CATHOLIC CHURCH | ) |
| /REVEREND FATHER CHARLES | ) |
| EDEH, | ) |
| KINSLEY KELECHI OGIDEH, | ) |
| LIVINITY OKPARAEKE. | ) |
| | ) |
| | ) |
| Defendants. | ) |

Case: 1:19-cv-02945   JURY DEMAND
Assigned To : Mehta, Amit P.
Assign. Date : 10/1/2019
Description: PRO SE GEN CIV (F-DECK)

Jury Trial: Yes.

Complaint

STATUTORY CAUSE OF ACTION:490 CABLE/SATELITE TV-PRIVACY VIOLATION

47 U.S.C.§551(C)(1) Except as provided in paragraph (2), a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned and shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the subscriber or cable operator.

RECEIVED

OCT 0 1 2019

Clerk, U.S. District and
Bankruptcy Courts

Plaintiff, Emmanuel Agbara ("Plaintiff"), brings this Complaint for statutory violation of rights granted to Plaintiff as a subscriber to AT&T Mobility, LLC ("AT&T") wireless services ("cellphone")  against defendant AT&T for the disclosure of plaintiff's personally identifiable information without a statutorily required prior written or electronic consent from plaintiff in violation of 47 U.S.C. § 551(c)(1) and unlawful grant of access to plaintiff's cellphone account and personally identifiable information to a third party or parties in violation of 47 U.S.C. § 551(c)(1); and plaintiff brings this Complaint against four other named defendants for their roles in the unlawful access to, and disclosure of plaintiff's identifiable information under the same Act.

## NATURE OF THE ACTION

1. This Complaint concerns a statutory violation of plaintiff's rights to privacy granted under 47 U.S.C.§551(C)(1) to protect plaintiff's personally identifiable information (PII) in the custody of defendant AT&T from unauthorized disclosure to, and access by an unauthorized third party or parties without a prior written or electronic consent from plaintiff.[1]  This Complaint seeks to redress harms done to Plaintiff  by named defendants; specially defendant AT&T for unauthorized disclosure of plaintiff's identifiable information to a third party or parties and grant of access to plaintiff's cellphone account and personally identifiable information to a third party or parties in violation of 47 U.S.C.

---

[1] The Cable Communications Policy Act of 1984 specifies exemptions to a prior written consent from a subscriber prior to the disclosure of a subscriber's personally identifiable information which do not apply in this case because the disclosure was made to "a spouse" or "a caller" (Exhibits 2. FCC Complaint File, documents 1&2).

§ 551(c) (1). Further, the Complaint seeks to redress harms to plaintiff caused by four other named defendants- Ms. Okoji, Nigerian catholic Community at St. Jerome Catholic Church/Father Charles Edeh, Mr. Kinsley Ogideh and Mr. Livinity Okparaeke - for their various roles in the instant matter.

## I.    JURISDICTION AND VENUE

### Subject Matter Jurisdiction

2. This Court has subject matter jurisdiction over this matter, pursuant to 28 U.S.C. § 1331, because the matter arises under the laws of the United States.

3. The Cable Communication Policy Act gives the Court jurisdiction over a violation of the Act: "Any person aggrieved by any act of a cable operator in violation of this section may bring a civil action in a United States district court." 47 U.S.C. § 551(f)(1).

### Personal Jurisdiction

4. This Court has personal jurisdiction over defendant AT&T because defendant AT&T provides nationwide telephone and wire services.

5. AT&T maintains a continuous and substantial business presence in the District of Columbia with physical office and retail outlets and has a large customer base in individual, corporate and government agency subscribers.

### Diversity of Citizenships between plaintiff and all named defendants

6. Plaintiff Emmanuel Agbara is domiciled in the District of Columbia.

7. All named four defendants are citizens of different states from plaintiff's state of domicile.

8. Defendant AT&T is a corporate entity incorporated in the State of Delaware and has a principal place of business in the State of Georgia at 1025 Lenox Park Blvd NE, Atlanta, Georgia, 30319

9. Defendant Evelyn Onyinye Okoji is domiciled in the State of Maryland with last known address at 5217 Newton Street, Apt. 303, Bladensburg, Maryland, 20710.

10. Defendant Nigerian Catholic Community at St. Jerome Catholic Church/ Reverend Father Charles Edeh are domiciled in the State of Maryland with last known address at St. Jerome Catholic Church 4313 Gallatin Street, Hyattsville, MD, 20781/5207 42nd Pl, Hyattsville, Md, 20781.

11. Defendant Kingsley Kelechi Ogideh is domiciled in the State of Maryland with last known address at 12123 Elmwood Dr., Brandywine, MD, 20613.

12. Defendant Livinity Okparaeke is domiciled in the State of Maryland with last known address at 1804 Waesche Court, Bowie, Maryland 20721.

13. The amount in controversy is more than seventy-five thousand dollars ($75,000.00.)

*Venue*

US District Court for the District of Columbia is a proper venue for this Complaint because it is a district court of the United States of America and the Cable Communications Act of 1984 authorizes an aggrieved party under the Act to bring a civil action under 47 U.S.C. § 551(f)(1) in a United States district court for redress.

Plaintiff and AT&T have personal connection to the District of Columbia and the United States District Court for the District of Columbia.

## II.    PARTIES

*Plaintiff*

14. Plaintiff Emmanuel Agbara is a natural person currently domiciled in the District of
    Columbia.

15. At all times relevant to this Complaint, Plaintiff was domiciled in the District of
    Columbia when AT&T unlawfully disclosed plaintiff's personally identifiable
    information on or about March 16, 2018 to Ms. Okoji, a third party or parties, without a
    prior written or electronic consent in violation of 47 U.S.C. § 551(c) (1).

*Defendants 1---5*

### *Defendant 1- --AT&T*

16. AT&T is a corporation organized in and existing under the laws of the State of Delaware
    with its principal place of business at 1025 Lenox Park Blvd NE, Atlanta, Fulton County,
    Georgia, 30319; USA.

17. At all times relevant to this matter, AT&T operated a cellphone business and provided
    plaintiff cellphone services and received payment from plaintiff.

18. At all times relevant to this matter, defendants AT&T and Ms. Okoji acted in concert to
    disclose Plaintiff's personally identifiable information to a third party or parties without a
    prior written or electronic consent from plaintiff and granted unauthorized access to
    Plaintiff's personally identifiable information to a third party or parties without a prior
    written or electronic consent from plaintiff in violation of plaintiff's privacy rights under
    47 U.S.C. § 551(c) (1).

19. AT&T hacked plaintiff's cellphone account on or about March 16, 2018, changed plaintiff's passcode and disclosed plaintiff's personally identifiable information to a third party or parties without a prior written or electronic consent from plaintiff in violation of 47 U.S.C. § 551(c) (1).

20. As a result of the wrongful acts of AT&T, plaintiff suffered loss of privacy, property damage, emotional pain and suffering.

### Defendant 2—Evelyn Onyinye Okoji

21. Defendant Evelyn Onyinye Okoji (Ms. Okoji") is a natural person currently domiciled in the State of Maryland with last known address at 5217 Newton Street, Apt. 303, Bladensburg, Prince George's County, Maryland, 20710.

22. At all times relevant to this matter, Ms. Okoji was domiciled in the state of Maryland.

23.  At all times relevant to this matter, defendants AT&T and Ms. Okoji acted in concert to violate plaintiff's rights under 47 U.S.C. § 551(c) (1).

24. Ms. Okoji acted in concert with Mr. Ogideh and Mr. Okparaeke to hack plaintiff's cellphone account to dig up dirt on plaintiff and to force plaintiff to abandon adultery as a grounds for a divorce.

25. As a result of the wrongful acts of Ms. Okoji, plaintiff suffered loss of privacy, property damage, emotional pain and suffering.

### Defendant 3 ---- Reverend Father Charles Edeh

26. Defendant Nigerian Catholic Community at St. Jerome Catholic Church ("the church") and Reverend Father Charles Edeh ("Father Edeh") who is a natural person are domiciled

in the State of Maryland at 4313 Gallatin Street, Hyattsville, MD, 20781/5207 42nd Pl, Hyattsville, Md, 20781.

27. At all times relevant to this natter, Father Edeh was the catholic priest for Nigerian Catholic Community at St. Jerome Catholic Church in Hyattsville, Maryland.

28. Father Edeh knew or should have known about the adulterous nature of a relationship which he personally initiated or facilitated between Ms. Okoji and two male members of the church – Mr. Livinity Okparaeke and Mr. Kinsley Kelechi Ogideh.

29. Father Edeh and his congregation of Nigerian Catholic Community at St. Jerome Catholic Church are vicariously liable for the injurious acts of members of his congregation in having adulterous relationship with Ms. Okoji and coercing Ms. Okoji to abort a pregnancy which she did in 2016 under the color of church ministries.

30. As a result of the wrongful acts of the church and Father Edeh, plaintiff suffered loss of privacy, property damage, emotional pain and suffering.

### Defendant 4 --- Mr. Livinity Okparaeke

31.  Defendant Livinity Okparaeke ("Mr. Okparaeke") is a natural person who is domiciled in the State of Maryland at 1804 Waesche Court, Bowie, Maryland, 20721.

32. At all times relevant to this matter, Mr. Okparaeke carried himself as a marriage or family counselor who provided marriage and family counseling to Ms. Okoji and the family at the direction of Father Edeh as a service of the Nigerian Catholic Community at St. Jerome Catholic Church.

33. At all times relevant to this matter, Mr. Okparaeke received sex and cash from Ms. Okoji for his church assignment to Ms. Okoji and the family.

34. Mr. Okparaeke acted in concert with Ms. Okoji to hack plaintiff's cellphone account to dig up dirt on plaintiff and to force plaintiff to abandon adultery as a ground for divorce.

35. As a result of the wrongful acts of Mr. Okparaeke, plaintiff suffered loss of privacy, property damage, emotional pain and suffering.

<u>Defendant 5 ---- Mr. Kinsley Kelechi Ogideh</u>

36. Defendant Kinsley Kelechi Ogideh ("Mr. Ogideh") is a natural person domiciled in the State of Maryland at 12123 Elmwood Dr., Brandywine, MD, 20613.

37. At all times relevant to this matter, Mr. Ogideh was a choir director at Nigerian Catholic Community at St. Jerome Catholic Church in Hyattsville, Maryland.

38. Mr. Ogideh used his position of power and influence as a choir director of the Nigerian Catholic Community at St. Jerome Catholic Church to seduce Ms. Okoji and develop an adulterous relationship with Ms. Okoji.

39. Mr. Ogideh received sex from Ms. Okoji at plaintiff's family home in exchange for prayer as a member of the choir of Nigerian Catholic Community at St. Jerome Catholic Church.

40. Mr. Ogideh acted in concert with Ms. Okoji to hack plaintiff's cellphone account to dig up dirt on plaintiff and to force plaintiff to abandon adultery as a ground for divorce.

41. As a result of the wrongful acts of Mr. Ogideh, plaintiff suffered loss of privacy, property damage, emotional pain and suffering.

### III.     STATURORY FRAMEWORK

<u>47 U.S.C. § 551</u> Protection of Subscriber Privacy

42. The Cable Communications Policy Act of 1984 gives subscribers to cable and wireless services protection to personally identifiable information and obligates providers and operators to protect subscribers' personally identifiable information from unauthorized disclosure or access to a third party or parties without a prior written or electronic consent from a subscriber such as plaintiff.

43. Cable and wireless communication providers require subscribers to provide personally identifiable information (PII) such as name, date of birth, a social security number, a credit card, a drivers' license, home and employment addresses as a condition of service.

44. A cable operator or wireless provider such as AT&T uses personally identifiable information to build a subscriber's profile which the Act also protects.

45. A subscriber's profile can be manipulated for different purposes by different actors on the internet; hence, Congress imposed an affirmation obligation on cable and wireless providers and operators to protect a subscriber's personally identifiable information from unauthorized persons and entities without a prior written or electronic consent and to take necessary actions to prevent unauthorized access to same under 47 U.S.C. § 51(c)(1).

46. To avoid stifling good-faith commerce and governmental functions, Congress imposed stringent conditions under which cable and wireless providers and operators may disclose a subscriber's personally identifiable information. 47 U.S.C. § 551(c) (2) and 47 U.S.C. § 551(h).

## IV.    FACTUAL BACKGROUND

47. Plaintiff Emmanuel Agbara ("Plaintiff"), has been a subscriber to AT&T wireless telephone ("cellphone") for more than ten years and pays for the services.[2]

---

[2] Plaintiff was a customer with Cellular One before its merger with AT&T.

48. AT&T collected and maintains plaintiff's personally identifiable information (PII) such as name, date of birth, a social security number, a credit card, a driver's license, home and employment addresses as a condition of service.

49. AT&T uses plaintiff's personally identifiable information in the course of business to generate revenue and profit and to maintain and grow its market share.

50. AT&T and its business partners use plaintiff's personally identifiable information (PII) to build plaintiff's profile for commercial gains as allowed by law.

51. AT&T requires plaintiff to establish an account passcode to safeguard against unauthorized and accidental intrusions into plaintiff's cellphone account.

52. Plaintiff established a passcode, memorized it and did not share it with anyone else.

53. AT&T led plaintiff to believe that an account passcode was a safe and secure protection against third party intrusion into plaintiff's account and that such passcode cannot be altered or changed without the expressed consent and prior knowledge of plaintiff as a subscriber.

54. On March 16, 2018, at 7:00 PM, defendant AT&T sent a text message to Plaintiff that it had changed plaintiff's passcode without a prior written consent or electronic consent as required under 47 U.S.C. § 551(c)(1): "Your Account Passcode has been changed for acct # ending in 1335. If this was done in error, call 1-800-331-0500 or 611 from your wireless phone." (Exhibit #1. AT&T text message dated March 16, 2018).

55. Plaintiff called 1-800-331-0500 soon after plaintiff had received the text message; but was unable to access plaintiff's cellphone account because AT&T had changed the personal identification number (PIN) or passcode of plaintiff's cellphone account.

56. On Monday, March 19, 2018, panicked that someone had hacked plaintiff cellphone, plaintiff travelled to Baltimore to FBI field office and reported the incident as a possible hacking of plaintiff's cellphone account.[3]

57. Thereafter, plaintiff contacted AT&T by phone concerning AT&T's change of plaintiff's passcode on account # ending in 1335 without a responsive answer on the telephone.

58. Plaintiff, thereafter, went to an AT&T corporate outlet at 7491 Greenbelt Road, Greenbelt, MD, 20770 for the same concern.

59. At the corporate AT&T outlet, a person who identified himself as a manager, informed plaintiff that a caller from 202-594-0568 had requested changes in the cellphone account ending in 1335 and that an AT&T employee named Mr. Carlos Salamanca had worked with the caller to effect changes in the cellphone account ending in 1335.

60. The manager refused to provide plaintiff with the identity of the caller.

61. On March 20, 2018, plaintiff filed a complaint with the Federal Communications Commission (FCC) concerning the conduct of AT&T in this matter.

62. In a telephone negotiation over the matter, Ms. Dena Murray of the Office of the President of AT&T acknowledged that an AT&T employee who had handled a call from

---

[3] "FBI announces charges against 80 people in cyber fraud, money laundering schemes" at https://www.foxla.com/news/fbi-announces-charges-against-80-people-in-cyber-fraud-money-laundering-schemes highlights the risks of internet transactions and identity theft. Plaintiff faces increased risk of identity from the named defendants or misuse of his PII.

an unidentified caller to change plaintiff's cellphone account broke AT&T's policy and

procedure on handling such a request and that the employee would face disciplinary

action.

63. The complaint produced correspondences between AT&T and plaintiff; but failed to

produce satisfactory and conclusive answers on the matter (Exhibits2).[4]

64. In a correspondence dated April 2, 2018, AT&T stated that "a caller who identified

herself as the account holder's spouse…was able to verify information in order to

authenticate themselves as an authorized party" (Exhibit 2- NOIC dated 4/2/18).

65. In a correspondence dated May 1, 2018, AT&T stated: "AT&T has verified that the

passcode was changed on 03/16/2018, by a caller who was able to verify the wireless

account" (Exhibit 2- NOIC dated 5/1/18).

66. On May 8, 2018, Defendant Ms. Okoji testified at a merit divorce trial about her role and

the role of defendant AT&T in the hacking and unauthorized disclosure of Plaintiff's

personally identifiable information.

67. [Ms. Okoji] No. I said I wanted to print -- because Emmanuel is having affair with a

nurse -- a registered nurse. I want to print his phone records. [Counsel]: Didn't you go in

and change his access and try to change the bill? [Ms. Okoji]: I went to AT&T – (Exhibit

3. Divorce transcript: 5-8-18, p. H-182). ──-[Counsel] And then from June 18 to July 27,

2017, you had 237 text messages that month with Mr. Kingsley, correct? [Ms. Okoji]: I

---

[4] Exhibit 2: Response to Notice of Informal Complaint (NOIC) dated 4/2/2018; Plaintiff letter

dated 4/26/2018; Response to Notice of Informal Complaint (NOIC) dated 5/1/2018 and FCC

complaint activities log.

don't know. All I know is I want to go at AT&T and get his phone. They said I can't pull his phone because he's having two women that cook for him. That is why he is not eating my food (Exhibit 3. Divorce transcript: 5-8-18, p.H-184).

68. In 2014, soon after Ms. Okoji became pregnant with our son, Ms. Okoji asked plaintiff if a husband could be charged with rape of a wife in America. Sex between Ms. Okoji and plaintiff stopped on that account and never restarted (Exhibit 3. Divorce transcript: 5-7-18, p. H-82).

69. In June of 2015, Ms. Okoji was raped in Silver Spring, Maryland by a man who had promised her a job at a law firm and had invited her to a job interview at 8:30 PM on Wisconsin Avenue.

70. Plaintiff asked Ms. Okoji to report the sexual assault to police. Ms. Okoji refused; arguing that plaintiff wanted to sue the attacker for money so plaintiff could stop working double shift.

71. On our son's first birthday in January 2016, Ms. Okoji was several months pregnant by another man.

72. The evidence will show that Ms. Okoji reported a prior pregnancy in Nigeria at her prenatal care visit at Providence Hospital.[5]

---

[5] Ms. Okoji: "I've never been pregnant" (Exhibit 2. Divorce transcript, 5-8-18, p. H-58).

73. Between January and April 2016, Ms. Okoji had a burst of medical appointments with multiple healthcare providers and reported one sex partner 2016.[6]

74. The evidence will show that Ms. Okoji received vaccination against sexually transmitted disease consistent with active, multi-partner, risky sexual behavior.

75. The three other named defendants – Nigerian Catholic Community and Reverend Father Charles Edeh, Kingsley Kelechi Ogideh and Livinity Okparaeke belong to Nigerian Catholic Community at Saint Jerome Catholic Church ("The church") in Hyattsville, Maryland.

76. The church served Ms. Okoji as a sexual reward to a community of two men: Mr. Livinity Okparaeke and Mr. Kinsley Ogideh of the Nigerian Catholic Community at St. Jerome Catholic Church, Hyattsville, Maryland.

77. Father Edeh introduced Mr. Livinity Okparaeke to Ms. Okoji at a church function.

78. Father Edeh assigned Mr. Okparaeke, a home aide, without a formal or informal education, training or apprenticeship in marriage counseling to counsel Ms. Okoji ("advice and encourage") in her marital problems as a part of church outreach services to members.[7]

---

[6] Plaintiff and Ms. Okoji stopped sex in 2014, long before the birth of our son and never resumed. According to Ms. Okoji, "So he stopped having -- we had sex like two or three times, not really constant" (Exhibit 2. Divorce transcript 5-8-18, p. H-54).

[7] (Livinity Okparaeke) A. I met Ms. Okoji at the church.  Q. And who introduced you?  A. --- Okoji was asking Father Chowce (Charles) something, and Father Chowce said, I don't have time, ma'am. He called me up and said, "Please, can you give this lady my phone number" (Exhibit 3.

79. An adulterous relationship developed among Ms. Okoji, Mr. Okparaeke and Mr. Ogideh which produced a pregnancy and an abortion by Ms. Okoji at plaintiff's family home in 2016 (Exhibit 3. Divorce transcript: 5-7-18, p. H-83 & Exhibit 5: Abortion site photos).

80. Ms. Okoji offered a novel theory of female circumcision as a defense against adultery (Exhibit 3. Divorce transcript: 5-8-18, p. H-68).

81. At all times relevant to this matter and during the relevant period that Ms. Okoji was a member of the Nigerian Catholic Community at St. Jerome Catholic Church in Hyattsville ("the church"),[8] Father Edeh ("Father Edeh") led the church.

82. The church was a sex clearing house for Ms. Okoji who testified in court that she did not "feel sex" because she "was circumcised" and wanted sex only "for procreation" in her role as a community woman for Mr. Livinity Okparaeke and Mr. Kinsley Ogideh, two married men and members of the catholic church community[9] who forced abortion on

---

Divorce transcript: 5-7-18, page 168) …. "Then the next—two days, then we had exchange, the priest at Saint Jerome called me and said, "Please, Evelyn and the child has been discharged from the hospital," and please could I go over there to pick them up and send them to the house…." (Exhibit 3. Divorce transcript: 5-7-18, pages pp. H-180-181).

[8] Plaintiff subpoenaed Mr. Livinity Okparaeke and Kingsley Kelechi Ogideh (the later hid from the process server and did not testify at the divorce trial), two male members of the Nigerian Catholic Church at St. Jerome Catholic Church, Hyattsville, Maryland because of their long running sexual relationship with Ms. Okoji and a reasonable belief that they impregnated Ms. Okoji and forced her to abort the pregnancy which plaintiff witnessed at the family home.

[9] "You know, we have a community" (Exhibit 3. Divorce transcript, 5-8-2018, p. H-175).

Ms. Okoji while she was still married to plaintiff (Exhibit 3. Divorce transcript 5-8-2018, p. H-68).

83. Ms. Okoji stated that she did not "feel sex," not that she did not have sex and fulfill her role as a community woman for sex in the community of catholic church men at the Nigerian Catholic Community at St. Jerome Catholic Church, Hyattsville, Maryland.[10]

84. Father Edeh assigned Mr. Okparaeke to counsel Ms. Okoji on family and marital issues but failed to supervise Mr. Okparaeke in his church assignment with Ms. Okoji; and that failure to supervise Mr. Okparaeke was a material factor in a sexual relationship which developed and went on among Ms. Okoji, Mr. Ogideh and Mr. Okparaeke for several months and produced a pregnancy and an abortion at plaintiff's family home in 2016 that destroyed plaintiff's furniture and other properties.[11]

85. Father Edeh kept in contact with Ms. Okoji by telephone and home visit and had opportunity to inquire about the nature of the relationship between Ms. Okoji, Mr. Okparaeke and Mr. Ogideh and to supervise them; but failed to exercise reasonable care to inquire and supervise them over church related activities in the community.

86. Father Edeh has continued to provide Ms. Okoji material support in our post-divorce court hearing.

---

[10] Evelyn Okoji developed acute inflammation of the rectum for which plaintiff paid cash for anti-inflammatory suppository for fourteen days because plaintiff's insurance did not cover it.

[11] THE COURT: So at the time you were her best friend and counselor, sort of? [Mr. Livinity]: That is what I and my wife is doing in the family (Exhibit 3. Divorce transcript: 5-7-18, p. H-178).

87. Mr. Okparaeke received sex and cash from Ms. Okoji for counseling and encouragement. "And since this is my first check, please, if I'm going" -- "if I'm going back to my office I should stop by at her office. "Then when I said okay, when I dropped down, she put -- took in the envelope, and said, "Please, this is my appreciation for all your help. For all your kind help in the family, in taking" -- "in advice and encouraging her." I am the only person that encouraged her to get to this point" (Divorce transcript, 5-7-18, pp. 177-178).

88. Mr. Okparaeke declared a desire to plead the Fifth Amendment at the divorce trial on May 7, 2018 in response to questions about his sexual relationship with Ms. Okoji.[12]

89. Mr. Okparaeke testified in response to questions about texting between him and Ms. Okoji: "Because we don't see, rather we text." (Exhibit 3. Divorce transcript: 5-7-18, p. H-169); but went on to describe numerous times that he and Ms. Okoji were alone together (Exhibit 4. Testimonies showing some occasions when Mr. Okparaeke and Ms. Okoji met in person and were alone together.)

90. Mr. Okparaeke testified that his assignments from Father Edeh with Ms. Okoji was "a couple of work of mercy" on behalf of the church (Exhibit 3. Divorce transcript: 5-7-18, p. H-181.)

---

[12] [Mr. Okparaeke]: Excuse me, Your Honor. I believe -- I don't --know this family and I don't have any really advance information on what is happening. And I want to plea for the Fifth Amendment rights. Let Emman and the family sort through their matter. THE COURT: I see. So you have a right, sir, because what you're being asked is if you committed adultery with the defendant (Divorce transcript 5-7-18, p. H-150).

91. The adulterous relationship between Mr. Okparaeke and Ms. Okoji produced a pregnancy and an abortion by Ms. Okoji at plaintiff's family home in 2016.

92. At all times relevant to this matter and when Evelyn Okoji was a member of the Nigerian Catholic Community at Saint Jerome Catholic Church, Hyattsville, Maryland, Mr. Ogideh was the choir director at the Nigerian Catholic Community at Saint Jerome Catholic Church.[13]

93. Mr. Ogideh used his position of power and influence in the Nigerian Catholic Community at Saint Jerome Catholic Church to seduce Ms. Okoji into an adulterous relationship.

94. [Plaintiff]: "The one who is not here is Kingsley Obita (phonetic). I caught Mr. Kingsley Obita and my wife at the house, where they were holding hands coming out about 10:00 p.m. one night. I caught both of them at the house" (Exhibit 3. Divorce transcript: 5-7-18, p. H-82).

95. Mr. Ogideh described his visit to Ms. Okoji at night as a prayer visit in response to an invitation from Ms. Okoji to the Nigerian Catholic Community choir at St. Jerome Catholic Church and that he had come to pray alone with Ms. Okoji having missed a chance to come as a group with the choir.

96. The three named male co-defendants from Nigerian Catholic Community at St. Jerome Catholic Church collectively or individually coerced Ms. Okoji into a late term abortion to hide the involvements of the church and the three named co-defendants in an adulterous relationship, adulterous pregnancy and abortion.

---

[13] Ms. Okoji attended Mountain of Fire, a Pentecostal church, she left Father Edeh's church.

97. Further, the three named male co-defendants from Nigerian Catholic Community at St. Jerome Catholic Church collectively or individually coerced Ms. Okoji into hacking plaintiff's cellphone account for dirt to blackmail plaintiff into abandoning a divorce on the grounds of adultery.[14]

98. Plaintiff has physical evidence of the home abortion by Ms. Okoji in blood-soaked carpet and mattress.

99. The photo evidence of the site where Ms. Okoji aborted a pregnancy by another man shows the location on the carpet where the live fetus from Ms. Okoji dropped and lay for several hours before it stopped breathing.

100.     The photo evidence shows a pool of blood on the edge of the wall inside the abortion room from Ms. Okoji's water break.

101.     More photos show the horror of home abortion in uncontrolled bleeding on the mattress and floor throughout the room.

102.     The evidence will show that Ms. Okoji was prescribed Motrin for pain and Flexeril, a muscle relaxant to help expel the fetus.

103.     Ms. Okoji stuffed the fetus and placenta together in a plastic bag and put it out for trash collection the next day.

---

[14] "First of all, the grounds for divorce. If you remove the adultery, that will take a lot of (indiscernible - 10:29:24)" (Exhibit 3. Divorce transcript: 5-7-18, p. H-18). I understand she's asking for alimony and a monetary award. And if she is asking for those things, and the adultery testimony evidence comes in because it weighs against her getting those things, so I was trying to get some clarity on what she wanted (Exhibit 3. Divorce transcript: 5-7-18, p. H-19).

104.     The blood-soaked carpet and mattress contain sufficient specimens of bloody body fluids from Ms. Okoji and the fetus plus fetal tissues for DNA test.

105.     Comparative DNA tests of the three named male co-defendants with specimen DNA tests will identify which male defendant impregnated Ms. Okoji while she was still married to plaintiff.

106.     Father Edeh, Mr. Okparaeke, Mr. Ogideh and Ms. Okoji, all from Nigerian Catholic Community at St. Jerome Catholic Church, were responsible for an adulterous relationship which developed into a bond among Ms. Okoji, Father Edeh, Mr. Ogideh and Mr. Okparaeke and further gave birth to common interests among all four defendants to force abortion on Ms. Okoji; and in turn, hack plaintiff's cellphone in conjunction with AT&T for dirt to secure plaintiff's silence on adultery and abortion.

## V.     STATEMENT OF CLAIMS AS TO AT&T

### Count 1

Unlawful disclosure of Plaintiff's Personally Identifiable Information to a third party or parties thereby causing Plaintiff loss of privacy, emotional distress and pain in violation of 47 U.S.C. § 551(c)(1)

107.     AT&T disclosed Plaintiff's personally identifiable information to a third party, defendant Ms. Okoji, and other unidentified parties without a prior written consent or electronic consent from plaintiff in violation of 47 U.S.C. § 551(c)(1).

108.     AT&T allowed access to plaintiff's cellphone account and personally identifiable information by a third party or parties without a prior written consent or electronic consent in violation of 47 U.S.C. § 551(c)(1).

109.     AT&T changed plaintiff's account passcode for cellphone account ending in 1335 without a prior written or electronic consent from plaintiff in violation of 47 U.S.C. § 551(c)(1)

**COUNT 11**

Failure to "take such actions as are necessary to prevent unauthorized access to such information (personally identifiable information) by a person other than the subscriber or cable operator" thereby causing Plaintiff loss of privacy, emotional distress and pain in violation of the Cable Communications Policy Act of 1984 section 47 U.S.C. § 551(c)(1).

110.     AT&T failed to use reasonable care - "such actions as are necessary"- to prevent Plaintiff's personally identifiable information from being accessed by a third party or parties in violation of 47 U.S.C. § 551(c)(1) based on the content of a text message which AT&T had sent to plaintiff on March 16, 2018, Federal Communications Commission (FCC) complaint file on the matter, and the testimony of co-defendant Ms. Okoji on the matter in a merit divorce trial on May 8, 2018.[15]

---

[15] Ms. Okoji testified at a merit divorce trial on May 8, 2018: "I want to print his phone records. …. I went to AT&T.---" (Divorce transcript page H-182). "All I know is I want to go to AT&T and get his phone. They said I can't pull his phone because he's having two women that cook for him. That is why he is not eating my food" (Divorce transcript page H-184).

111.     AT&T failed to put in place necessary and sufficient industry standard checks and balances in the forms of software and policy to monitor, detect and prevent unauthorized intrusions and intruders on plaintiff's cellphone account and other similarly situated subscribers to AT&T's cellphone services in violation of 47 U.S.C. § 551(c)(1).

112.     AT&T failed to follow its own policy and procedures to monitor, detect and prevent an unauthorized third party or parties from obtaining plaintiff's personally identifiable information or accessing the same without a prior written or electronic consent from plaintiff in violation of 47 U.S.C. § 551(c)(1).[16]

**VI.**

**STATEMENT Of CLAIM AS TO DEFENDANT MS. OKOJI.**

113.     Ms. Okoji collaborated with AT&T to pull plaintiff's phone record without a prior written consent or electronic consent from plaintiff in violation of 47 U.S.C. § 551(c)(1).[17]

114.     Ms. Okoji sought and gained access to plaintiff's personally identifiable information from AT&T without a prior written consent or electronic consent from plaintiff.

---

[16] AT&T acknowledge in 2018 that an employee had not followed its policy and procedure for authenticating plaintiff's cellphone account.

[17] Q. But you did actually go in and try to change the account, didn't you? A. No. I wanted to print –because Emmanuel is having affair with a nurse – a registered nurse. I want to print his phone records" (Divorce transcript May 8, 2018, page H-182).

115.     Ms. Okoji sought and gained possession of plaintiff's personally identifiable

information from AT&T without a prior written consent or electronic consent from

plaintiff.

**VII.**

**STATEMENT OF CLAIM AS TO DEFENDANT REVEREND FATHER CHARLES
EDEH PERSONALLY AND IN HIS CAPACITY AS PRIEST TO THE NIGERIAN
CATHOLIC COMMUNITY AT ST. JEROME CATHOLIC CHURCH, HYATTSVILLE,
MARYLAND.**

116.     Negligent assignment to Mr. Livinity Okparaeke, a lay member of the Nigeria

Catholic Community at St. Jerome Catholic Church, a personal care assistant by trade, to

counsel Ms. Okoji on family and marital matters.[18]

117.     Negligent in a "sex-for-counseling" and "sex-for-therapy" church assignment by

Father Edeh to Livinity Okparaeke, a personal care assistant by trade, to provide family

and marriage counseling and therapy to Ms. Okoji; and failed to supervise the church

assignment of Mr. Okparaeke and allowed the assignment to develop into an adulterous

relationship between Ms. Okoji and Mr. Okparaeke which produced an adulterous

pregnancy and abortion at plaintiff's family home.

---

[18] Mr. Livinity Okparaeke testified at the merit divorce trial of plaintiff and Ms. Okoji that Father

Edeh assigned him to "a couple of work of mercy" to assist Ms. Okoji with family and marriage

problems in her marriage (Divorce transcript 5-7-2018, p. 181). "THE COURT: So at the time

you were her best friend and counselor, sort of? [Livinity Okparaeke]: That is what I and my

wife is doing in the family" (Divorce transcript 5-7-18, p.178).

118.     Negligent in the hacking of plaintiff's cellphone in 2018 in which Ms. Okoji was a front to cover up an adulterous relationship between Ms. Okoji and members of the Nigerian Catholic Community at St. Jerome Catholic Church in Hyattsville, Maryland.

119.     Negligent in property destruction from an aborted fetus and bloody body fluids at plaintiff's family home by Ms. Okoji for coercing Ms. Okoji into aborting a pregnancy at plaintiff's family home.

VIII.

## STATEMENT Of CLAIM AS TO DEFENDANT MR. OKPARAEKE

120.     Fraudulent practice of family and marriage counseling and/therapy in exchange for sex and cash.

121.     Failure to report compensation of income from the practice of family and marriage counseling and/therapy to the Internal Revenue Services in 2016.

122.     Negligent in the hacking of plaintiff's cellphone in 2018 in which Ms. Okoji was a front to cover up an adulterous relationship between Ms. Okoji and members of the Nigerian Catholic Community at St. Jerome Catholic Church in Hyattsville, Maryland.

123.     Negligent in property destruction from an aborted fetus and bloody body fluids at plaintiff's family home by Ms. Okoji for coercing Ms. Okoji into aborting a pregnancy at plaintiff's family home.

IX.

## STATEMENT Of CLAIM AS TO DEFENDANT

## MR. KINGSLEY KELECHI OGIDEH

124.    Negligent in the hacking of plaintiff's cellphone in 2018 in which Ms. Okoji was a front to cover up an adulterous relationship between Ms. Okoji and members of the Nigerian Catholic Community at St. Jerome Catholic Church in Hyattsville, Maryland.

125.    Negligent in property destruction from an aborted fetus and bloody body fluids at plaintiff's family home by Ms. Okoji for coercing Ms. Okoji into aborting a pregnancy at plaintiff's family home.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests that the Court enter judgment in favor of plaintiff and as to AT&T enter the following orders:

1.  Award Plaintiff the sum of ten million dollars ($10,000,000.00) in actual and punitive damages.

2.  Award plaintiff court costs and labor cost.

3.  Award plaintiff all applicable statutory reliefs under 47 U.S.C.§ 551 (f)(2).

4.  Order defendant AT&T to indemnify plaintiff for any and all losses resulting from, or related to the instant Complaint.

As to all other defendants, Plaintiff respectfully asks the Court to enter the following orders in favor of plaintiff against defendants Ms. Okoji, Father Edeh/The Nigerian Catholic Community at St. Jerome Catholic Church, Mr. Ogideh and Mr. Okparaeke individually and jointly:

1.  The sum of ten million dollars ($10,000,000.00) in actual and punitive damages.

2.  Award plaintiff court costs and labor cost.

3.  Award plaintiff all applicable statutory reliefs under 47 U.S.C.§ 551 (f)(2).

4.  Order defendants to indemnify plaintiff for any and all losses resulting from, or related to the instant Complaint.

Date: Oct. 01, 2019

Respectfully submitted

Emmanuel Agbara (Pro Se)

4017 5th Street, NW

Washington, DC, 20011

202-257-3402

firstzipcode@msn.com